Brennan H. Moss (10267)
PARKINSON BENSON POTTER
2750 Rasmussen Rd., Suite H-107
Park City, UT 84098
Email: brennan@pbp.law
Tel: (415) 534-7970

*Attorneys for Plaintiffs*

---

### IN THE UNITED STATES DISTRICT COURT

### THE DISTRCT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **NATALIE MOSS**, an individual suing on behalf of herself and as Guardian of minors T.M., and C.M., <br><br> Plaintiffs, <br><br> vs. <br><br> **UTE CONFERENCE INCORPORATED, a Utah non-profit corporation,** and **DOES I-X**. <br><br> Defendants. | **VERIFIED COMPLAINT** <br><br> Case No.: 2:24-cv-00578 <br><br> Judge _____ |

Natalie Moss ("Ms. Moss" or "Plaintiff"), suing on her own behalf and on behalf

of minors T.M., C.M. (the "Minor Plaintiffs")[1], hereby alleges and complains as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     Ms. Moss and minors T.M., and C.M. are citizens and residents of the State

---

[1] There are a large number of other similarly situated parties with common questions of law and fact as those set forth herein. The identity of the other parties is currently unknown to Plaintiffs. Plaintiffs intend to discover the identity of those individuals through discovery and reserves the right to amend this action to add other parties in interest as contemplated by Federal Rules of Civil Procedure 20 or 23, as applicable.

of Utah.

2.      Minors T.M. is 9 years old, and C.M. is 7 years old and are participants in the market of youth tackle football.

3.      Defendant Ute Conference Incorporated ("UCI" or "Defendant") is a Utah corporation that conducts business throughout the state, including Box Elder County, Davis County, Iron County, Morgan County, Salt Lake County, Summit County, Tooele County, Utah County, Wasatch County, and Weber County.

4.      Reference to UCI or Defendant herein shall also include, as appropriate, its affiliates, districts, successors, transferees and assignees, and the officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf.

5.      This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1337 which grants this exclusive jurisdiction over antitrust regulations.

6.      This Court has subject matter jurisdiction over violations of the Utah Antitrust Act pursuant to 28 U.S.C. § 1367 which grants the Court supplemental jurisdiction over claims that are so related to the claim in the action within such origination jurisdiction that they form part of the same case or controversy under Article III.

7.      The Utah Antitrust Act, Utah Code § 76-10-3104, was patterned after the Sherman Act, 15 U.S.C. §§ 1 and 2, therefore the claims involving violations of the Utah Antirust Act are not novel or complex issues of state law.

8.      The claims involving violations of the Utah Antitrust Act do not

substantially predominate the claim or claims sounding in the Sherman Act and Clayton Act.

9.     This Court has personal jurisdiction over UCI because UCI is a Utah corporation doing in Utah.

10.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because defendant resides in this judicial district, and a substantial part of the events giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated in this district.

11.     Plaintiffs seek monetary damages pursuant to the Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1 and 2, the Clayton Act Section 4, 15 U.S.C. § 15, and the Utah Antitrust Act, Utah Code § 76-10-3109(1) for three times the amount of damages sustained, plus the cost of suit, and reasonable attorney fees.[2]

12.     Plaintiffs have standing to bring this action for damages under antitrust laws including the Clayton Act Section 4, 15 U.S.C. § 15 which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor" in an appropriate federal district court, and the Utah Antitrust Act, Utah Code § 76-10-3109, which provides that "[a] person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or

---

[2] The identity of the other parties is currently unknown to Plaintiffs. Plaintiffs intend to discover the identity of those individuals through discovery and reserves the right to amend this action to add other parties in interest as contemplated by Federal Rules of Civil Procedure 20 or 23, as applicable. If other parties are added, the amount of damages will substantially increase.

indirectly with the defendant

13.     Plaintiffs also have standing to seek injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, provides that "[a]ny person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws," including Sections 1 and 2 of the Sherman Act, "when and under the same conditions and principles as injunctive relief ... is granted by courts of equity."

14.     Plaintiffs have been injured and are threatened to be injured because minors T.M. and C.M. have been removed from their teams in UCI's Olympus district and their ability to participate in youth tackle football is unreasonably restrained by UCI's boundary line restrictions and UCI's monopolistic control over the market.

15.     Plaintiffs seek non-monetary relief in the form on temporary, preliminary and permanent injunctive relief pursuant to the Section 16 of the Clayton Act, 15 U.S.C. § 26, and Utah Code § 76-10-3109.

## INTRODUCTION

16.     This is a civil action against UCI for violating Federal and State antitrust laws through horizontal agreements amongst its districts to prevent competition, by restraining commerce and trade through its boundary line restrictions, and by conspiring to monopolize, attempting to monopolize, and monopolizing markets related to youth tackle football in Utah.

## RELEVANT MARKETS

17.     As set forth herein, UCI illegally conspired with its districts to use and preserve its dominant position in the market of youth tackle football by creating the false

appearance that it is affiliated with local high school sports and enforcing its boundaries to unreasonably restrain trade and maintain a monopoly.

18.     The relevant markets related to the antitrust claims set forth herein is for youth tackle football. Although the markets include the sale of uniforms, equipment, concessions, fundraisers, the focus of the action is against the broader market of youth tackle football.

19.     The youth tackle football market is unique to other sports, even flag football, and youth tackle football is not interchangeable with substitute products.

20.     The youth tackle football market in northern Utah has been dominated by UCI for at least forty years.

21.     Youth tackle football in northern Utah has more than 8,000 participants, hundreds of teams, and dozens of divisions.

22.     Youth tackle football employs hundreds of coaches, referees, medical personal, game attendants, and game officials.

23.     UCI has monopoly over youth tackle football and controls the entire market in Northern Utah.

24.     The UCI is a private corporation that has been in existence since 1966.

25.     UCI's website declares that its philosophy and purpose are "to provide the opportunity for all players to enjoy and participate in the active competition of the game of football."

26.     UCI is registered as a 501(c)(3) non-profit corporation under EIN 87-0271884 as an organization that fosters "national or international amateur sports competition."

27.     UCI further claims that it qualifies for 501(c)(3) status because it is an organization that normally receives more than 33.3% of its support from contributions, membership fees, and gross receipts from activities related to its operations fostering national and international ammeter sports competition.

28.     UCI's revenue and assets are substantial for a youth sports organization.

29.     UCI's 2021 Tax Return to the IRS that "THE ORGANIZATION IS ESTABLISHED TO PROMOTE THE TEACHING OF FOOTBALL SKILLS, RULES OF THE GAME, AND THE IMPORTANCE OF TEAMWORK IN A SUPERVISED AND SAVE ENVIRONMENT TO THE YOUTH OF NORTHERN UTAH. FOR THE 2020 YEAR, THERE WERE 6,000 CHILDREN REGISTERED TO PLAY. THE UTE CONFERENCE, INC. HAD 37 DISTRICTS, IN 2020, THERE WERE 1,5000 COACHES COVERING 308 TEAMS." [sic].

30.     UCI's 2021 Tax Return claims contributions of $37,754 and revenue of $3,204,941.

31.     UCI's income mainly comes from registration fees, uniform fees, franchise fees, and concession income.

32.     UCI's 2021 Tax Return also claimed a net profit of $390,340 and that it was holding total assets of $2,252,316.

33.     Of UCI's assets, it is holding $1,831,236 in cash.

34.     UCI's Tax Return was verified by its Executive Director.

35.     UCI operates youth tackle football for players who are in second grade through ninth grade.

36.     The operation and supervision of a youth tackle football league is trade or

commerce as defined by Utah Code § 76-10-3103.

37.   The ability to participate in youth tackle football

38.   UCI has grown since 1966 to be the main conference for youth tackle football.

39.   UCI represents that in 2024 it has over 8,000 players currently registered within its conference.

40.   This number represents most of the youth football players in Salt Lake County.

41.   UCI divides its conference into districts that corresponds with the state school district boundaries and the Utah High School Sports Athletics Association ("UHSAA").

42.    UCI names its districts after the names of the corresponding high schools and adopts the corresponding high school's logo, colors, uniforms, and other marks.

43.   For example, the UCI district that mirrors Olympus high school district, is called the Olympus district, and uses the same logo as Olympus High School:



44.   The UCI website identifies its divisions by using the corresponding high

school's logo and marks. (See a printout of UCI's website, attached as Exhibit A.)

45.     UCI creates uniforms for the youth teams that look substantially similar to the corresponding high school.

46.     The UCI uniforms use the same color scheme, logos, marks, and names as the corresponding local high school.

47.     UCI appropriates the local high school's colors, logos, marks and names for an economic advantage to attempt to monopolize, and have in fact used the colors, logos, marks and names to create a monopoly.

48.     By appropriating the names of local high school names and logos and creating districts that match state school districts, UCI creates the impression that its organization is sanctioned by UHSAA.

49.     UCI's appropriation of corresponding high school boundaries and high school names gives the impression that UCI acts an official conduit to high school.

50.     By creating that impression, UCI creates a monopoly because youth tackle football players that ultimately want to play for the corresponding high school are compelled to only play for UCI.

51.     UCI's appropriation of corresponding high school boundaries, names, logos, and uniforms creates a perceived connection between the UCI players and the UHSAA teams.

52.     Many consumers and market participants have the impression that UCI is controlled by the UHSAA.

53.     Because UCI jersey match local high school jerseys, UCI players often wear their UCI jerseys to local high school games to show their connection to the local high

school.

54.     One of the benefits that only UCI can offer the market is that its player are connected to the local high school because they play under the same name, logo, and in the same uniforms as the corresponding UHSAA teams.

55.     UCI's appropriation of corresponding high school boundaries, names, colors, and markets provides the perception that UCI is the "farm league" for local high school football.

56.     This perception is valuable to UCI because it creates a demand for participants to joint its youth tackle football league.

57.     UCI's appropriation of corresponding high school boundaries and high school names does not have any legitimate business purpose because UCI is not legally affiliated with the local high schools or UHSAA.

58.     UCI's purpose in appropriating corresponding high school boundaries, names, logos, and colors is an attempt to monopolize by destroying or lessening competition of other youth football leagues by acting as an official youth league of UHSAA.

59.     One of the ways UCI propagates its monopoly is through the use of its boundary lines.

60.     In addition to using local schools' marks, by tying UCI's districts to the state school boundaries UCI gives perceived legitimacy to the impression that UCI is an affiliate of the local high school.

61.     UCI's boundary lines are implemented to make players believe that they are playing within the local high school system, which is an attempt to monopolize by

destroying or lessening competition of other youth football programs.

62.     UCI's attempts to monopolize have destroyed competition because it is nearly impossible for other youth tackle football programs to enter the market to compete against the UCI's perceived local high school system.

63.     The only value is appropriating the local corresponding high school boundaries, names, logos, and colors is if there is only one conference.

64.     Having more than one conference that used local corresponding high school names logos and marks would create market confusion.

65.     If multiple leagues operated youth tackle football and identified their teams with corresponding high school boundaries, names, logos, and colors, then the youth leagues could only be differentiated by their conference names instead the appropriated high school names.

66.     UCI understands this and maintains its appropriation to monopolize the market.

67.     Other sports leagues, for example, do not use local high school boundaries and names in the way UCI implements them.

68.     Other sports leagues identify their teams by made up names, or pro sports teams (i.e., Jr. Jazz).

69.     Accordingly, UCI benefits from the monopoly of being the only youth football conference that uses the high school names.

70.     UCI's efforts to monopolize have been successful as it has created a monopoly of youth tackle football in many parts of the state, including Plaintiffs' domicile.

71.     UCI control of the youth tackle football market operates as a monopoly or creates a dangerous possibility of creating a monopoly.

72.     UCI's monopoly has stifled competition that is fundamental to the free market system.

73.     A market participant in Northern Utah can only play youth tackle football in UCI's system and under its rules.

74.     A market participant cannot, for example, form a team to compete against any other youth tackle football teas, because all other youth tackle football teams are controlled by UCI.

75.     This means that market participants are not free to sign up 14 players to form a team and compete against other youth football teams

76.     UCI's monopoly has suppressed the unrestrained interaction of competitive forces that will produce the highest quality and greater material progress.

77.     In or about July 2024 Plaintiff looked at options to register minors T.M. and C.M. for youth tackle football.

78.     Because of UCI's monopoly, at the time of registration, the only option to play youth tackle football in Salt Lake County was offered by UCI.

79.     Because UCI's monopoly over youth tackle football, all of T.M. and C.M.'s classmates and friends playing youth tackle football, signed up with UCI.

80.     Because of UCI's monopoly over youth tackle football, all of Plaintiffs family friends and acquaintances that coached youth tackle football near their domicile, coached for UCI.

81.     T.M. and C.M.'s siblings, cousins, friends, and their classmates' older

siblings attend Olympus High School.

82.     T.M. and C.M. plan to attend Olympus High School when they reach high school age.

83.     Because of UCI's use of Olympus' marks and logos, T.M. and C.M. want to play for UCI's Olympus team.

84.     In or about July 2024, Plaintiff registered minors T.M. and C.M. to play with their classmates and friends in the Olympus district and paid their registration fees.

85.     Plaintiffs had made the decision as market participants to sign up for youth tackle football.

86.     Because UCI was the only local organization that offered youth tackle football, Plaintiffs elected to sign up in the Olympus district because the Olympus District boundaries corresponded with the district where T.M. and C.M. attend elementary school, and it is the district where T.M. and C.M. plan to eventually attend high school.

87.     T.M. and C.M.'s sisters attend Olympus Junior High and Olympus High School.

88.     T.M. and C.M.'s siblings play sports for and are on student government for Olympus High School.

89.     Ms. Moss is the PTA President for Olympus High School.

90.     T.M. and C.M. made the decision as market participants to play in the Olympus District so they could play with friends, neighbors, and classmates.

91.     T.M. and C.M. also decided to sign up in the Olympus District because they wanted to be part of the teams that appear to be associated with Olympus High School, where they plan to attend one day.

92.     In or about July 2024, minors T.M. and C.M. were fitted for equipment by the Olympus District.

93.     T.M. attended football tryouts for the Olympus Gremlin team.

94.     T.M. attended the football tryouts with his friends, neighbors, and classmates daily from July 29 through August 2, 2024.

95.     Many of the other players at the tryouts played with T.M. in other leagues for flag football, baseball, basketball, and lacrosse.

96.     On or about August 2, 2024, T.M. was selected to play for the Olympus Gremlin B Team.

97.     The Olympus Gremlin B Team subsequently ordered and issued two jerseys to T.M. (home and away) with T.M.'s name and number on the back.

98.     C.M. attended football tryouts for the Olympus Scout team.

99.     C.M. also attended the football tryouts with his friends, neighbors, and classmates daily from July 29 through August 2, 2024.

100.    Many of the other players at the tryouts played with C.M. in other leagues for flag football, baseball, basketball, and lacrosse.

101.    Some of the other players at the tryouts with C.M. had played with T.M. the prior year and were familiar to C.M.

102.    On or about August 1, 2024, C.M. was selected to play for the Olympus Scout A Team.

103.    The Olympus Scout A Team subsequently ordered and issued two jerseys to C.M. (home and away) with C.M.'s name and number on the back.

104.    T.M. and C.M. attended practice for their respective teams on August 5 and

6, 2024.

105.     On the evening of August 6, 2024, Ms. Moss received an e-mail informing her that her sons did not live in UCI's boundary for the Olympus district and T.M. and C.M. had been removed from the roster.

106.     Plaintiffs live less than 800 feet from UCI's defined district for Olympus.

107.     UCI states that T.M. and C.M. are required to play for the Murray district even though T.M. and C.M. neither live in in the Murray district or know anyone in the Murray district.

108.     The Murray district teams do not need T.M. and C.M. to fill their rosters.

109.     T.M.'s Olympus teams need T.M. on the roster or they will have less than the required number of players.

110.     C.M. made the Olympus team roster and participates to the team.

111.     Driving T.M. and C.M. to the Murray District will place a large burden on Plaintiffs because it practices much further away than the Olympus district teams.

112.     Ms. Moss has six children and having to drive T.M. and C.M. extra distance to the Murray district places an extra burden on her and the children.

113.     The burden is such that it may prevent T.M. and C.M. from playing youth tackle football this year.

114.     Notwithstanding these facts, UCI is removed T.M. and C.M. from the roster on Olympus due to its boundary line restrictions.

115.     Although UCI appropriates the UHSSA names and logos, it does not follow UHSSA rules or state laws regarding participation sports within UCI's districts.

116.     Although UCI acts like UHSSA, it is not a governed by State actors or school

boards.

117.    UCI is a private corporation that provides a service for consumers.

118.    UCI restricts trade or commerce by placing unreasonable restrictions on market participants to play youth tackle football.

119.    Because UCI is a monopoly it is the only one that determines how the youth tackle football market works.

120.    The rules, regulations, and barriers to entry for youth tackle football are not natural because they are set by UCI instead of the free market.

121.    Market participants cannot challenge the rules or regulations with their behavior because they are unilaterally set by UCI.

122.    Upon information and believe, UCI has faced other claims that it forces UCI districts to use certain vendors so that UCI and its representatives can get kickbacks from the vendors.

123.    Not only is UCI's control over the market illegal under antitrust laws, but the control leads to absurd results for consumers.

124.    In Plaintiffs circumstance, instead of playing football with their friends, neighbors, and classmates, they are forced to play for a district where they do not live, do not have friends, neighbors, or classmates.

125.    While some market participates may deem it best to play in a district where they do not live, have friends, neighbors, or classmates, that decision should be made by the market participant and not by the monopoly.

126.    UCI controls where market participants can play.

127.    UCI's rule 7.1 states that it follows the rules and regulations of the National

Federal of State High School Associations.

128.    The National Federal or State High School Associations does not have any rules regarding boundary or area restrictions.

129.    To the contrary, UCI conspires with its districts to restrict commerce and trade by placing boundary restrictions on its players.

130.    UCI's boundary restrictions are a classic *per se* antitrust violation because it allocates and divides players between districts.

131.    UCI's rule 11.1 states, in part: "A player is eligible to play in the district in which the player resides as of the date the player is weighed-in and placed on an official roster."

132.    UCI's rule 11.1 prohibits a market participant from registering and playing for youth tackle football on the team it desires by forcing the player to register where the player resides.

133.    UCI's rule 11.1 means that a player cannot make the decision best for the market based upon the player's individual circumstances.

134.    Further, UCI's rule 11.5 states that "[i]n the event a district does not field a team in any classification as defined in herein, the player may, at his/her option, (1) play in the next higher classification in his/her "home district", or (2) compete for any adjacent district of his/her choosing in his/her designated age-weight classification."

135.    In Plaintiffs' case, its alleged district did not field a team for minors T.M. and C.M. but UCI prevents T.M. and C.M. from competing for an adjacent district because UCI claims 11.5 does not apply.

136.    Rule 11.5 does not apply because UCI carefully conspired with the district

president to merge the dissolved Cottonwood district into the Murray district.

137.   UCI's rule 11.6 states that "[i]n the event two or more districts are merged into a single district by vote of a majority of the district presidents with the conference, the newly-formed district's boundaries shall be comprised of the aggregate boundaries of all districts that were merged."

138.   That means that UCI manipulates the market so it can merge two districts rather than allow its Rule 11.5 to apply.

139.   UCI claims that if it has merged two districts then a player must play for the merged district, even if the player's original district does not field a team as contemplated by Rule 11.5.

140.   UCI's rules are contracts in restraint of trade and are enforced with the attempt to monopolize.

141.   UCI conspires with its districts to enforce the UCI boundary restriction rules. Anyone that does not go along with UCI's boundary line restrictions are banned from participating in youth tackle football.

142.   The creates absurd results for the market participants which are plainly manifested in Plaintiffs' case: instead of playing with friends, neighbors, and classmates, Plaintiffs are forced to play in another district in which it does not live, have friends, neighbors, or classmates.

143.   UCI claims that even though the Cottonwood District cannot field youth football teams, it merged the Cottonwood District with the Murray District so all player that live in the Cottonwood District must play in the Murray District.

144.   Upon information and believe, UCI contracted and conspired with its

district presidents to merge Cottonwood district with the Murray district with the specific intent to prohibit players from participating in the Olympus and Brighton districts.

145.   By forcing players in the Cottonwood district to play in the Murray district, UCI contracted and conspired to restrain trade by forcing players in the Cottonwood district to play for the Murray District instead of being able to choose to play for an adjacent district.

146.   UCI and its districts made this decision to manipulate the market to reduce competition and prevent market participants from engaging in the free market system.

147.   Ironically, although UCI creates the impression it is affiliated with local high schools and the UHSAA, its rules of eligibility are more restrictive than the UHSAA.

148.   Under the UHSAA an individual is may play for a high school if that student is enrolled in and attend the high school as a ninth-grade student. (UHSA By-laws Article 1.1.)

149.   The UHSAA's eligibility rules are set forth because "the right to and need for an education is paramount and superior to any privilege a student may enjoy to participate in interscholastic activities." (UHSAA By-laws § 1.1.6.)

150.   Under Utah law a student's school district corresponds with the student's residence, but Utah's open enrollment policy allows students to attend any district within the state so long as it is reasonably feasible. (Utah Code §§ 52G-6-302, 402)

151.   The means that a student may attend a school outside of its district and participate in sports for that school.

152.   The UHSAA also has transfer rules that allow students to participate at a new high school if they transfer high schools and meet certain requirement.

153.    To be clear, UCI is not a government agency, does not provide public education services, and its only ties to Utah public schools is for economic and monopolistic reasons.

154.    In contrast to the UHSAA rules, UCI's boundary rules do not serve any legitimate business or educational purpose.

155.    UCI's rules governing eligibility are aimed at controlling the market, creating and maintaining a monopoly for UCI, and restricting free trade.

156.    UCI does not allow its player to play in the district where he attends school.

157.    UCI does not allow players to transfer to a new district, even if the player transfer schools that corresponds with a new district.

158.    As a market participant, youth tackle football players should be free to participate in the market without a restraint on trade.

159.    UCI's restrictions on trade are not reasonable.

160.    The UCI boundary line restrictions do not make common sense. When Plaintiff informed C.M. that he was not be able to play for the Scout A team he said "It's because I'm not good enough, right?"

161.    This is detrimental because the restrictions make players feel they are not good enough to play with their friends and school mates, or do not live in in a good enough neighborhood to play.

162.    UCI claims that its boundary rules are required in order to prevent the creation of super teams.

163.    This reason is not reasonable for several reasons:

        a.  The majority of other sports leagues do not have boundary

restrictions and have operated that way for years.

    i.   The leagues that do not have boundary restrictions are not dominated by the creation of super teams.

    ii.   Utah law declares unrestrained interaction of competitive forces will yield the best results and this applies to the allocation of talent among youth sports

b.   The concern about super teams is not assuaged by the adoption of state school districts because the state school districts are not designed to uniformly distribute talent among youth sport

    i.   In fact, the boundary restrictions create a disparity of talent among UCI teams because some boundaries have more youth participants than others.

    ii.   The boundaries with more youth participants often have more talent to choose from to create better teams but UCI does not take any action to prevent these districts from creating super teams.

c.   UCI's own actions suggest it is not concerned about super teams.

    i.   UCI's allows divisions to divide up its teams if there is enough for at least 14 players per team.

    ii.   Most of UCI's districts have more than one team in each age group.

    iii.   The age groups are divided up by talent with A teams, B teams, C teams, etc.

d. The boundary restrictions do not protect participants from competing against super teams because market participants in districts with more children often have less opportunities to play due to the greater number of children.

e. In areas of the state where UCI does not have a monopoly, it allows teams to recruit from outside the boundary lines, in order to create super teams.

f. If the goal is to limit super teams there are less restrictive means to accomplish that goal that reasonably restrains trade.

164.    UCI'S anticompetitive acts identified above have had anticompetitive effects on competition in youth tackle football.

165.    UCI's rules governing eligibility limit competition and force players into a monopolistic structure.

166.    While the UHSAA and UCI are not comparable as an organization or as markets, the difference in application of participation rules demonstrates the absurdity of UCI's monopolistic control on the market.

167.    The confusion UCI creates among consumer and market participants by appropriating UHSAA names, logos, colors, and uniforms is highlighted by UCI's players confusion that UCI's participation rules are different than UHSAA.

168.    Further, UCI's refusal to adopt UHSAA rules and state laws regarding participations, demonstrates that UCI appropriated the UHSAA names and marks for commercial purposes only.

169.    UCI enforces its boundary restrictions in draconian ways.

170.   As demonstrated herein, Plaintiff lives less than 800 feet from the Olympus boundary line, T.M. and C.M. attend school within the Olympus network, T.M. and C.M.'s siblings play sports for and are on student government for Olympus High School, and Ms. Moss is the PTA President for Olympus High School. Notwithstanding these facts, UCI is removed T.M. and C.M. from the roster on Olympus.

171.   UCI states that if T.M. and C.M. want to play for UCI, they must play two districts away in Murray if they want to participate in youth tackle football.

172.   Ms. Moss is the mother of six children and does not have time to drive T.M. and C.M. thirty minutes to practice in the Murray district (the Olympus teams are less than five minutes away).

173.   UCI's boundary line restrictions mean that T.M. and C.M. cannot play youth tackle football because they are restrained from playing at the location that works for their situation.

174.   Other youth tackle football consumers have been exposed to safety issues due to UCI's boundary line restrictions. Consumers could not protect against those safety concerns and were not able to participate in UCI's league due to the boundary line restrictions.

175.   In the case where a participant elects to play out of UCI's district boundaries, UCI deems that player ineligible to play for the remainder of the current football season.

176.   In the case where a participant elects to play out of UCI's district boundaries by providing an incorrect address, UCI deems that player ineligible to play for the remainder of the current season and the entire next season.

177.     Because UCI has a monopoly on youth tackle football, that means a player is restrained from participating in the youth tackle football market at all during the times UCI restrains that player from playing.

178.     UCI's Olympus district recently banned some coaching candidates because it was discovered that they knowingly had out of boundary players on their team.

179.     UCI does not want its districts competing for players so it enforces its boundaries to prevent competition.

180.     UCI's rule dividing talent up by boundary and enforcing that rule with its district is a horizontal restraint on trade that is *per se* illegal.

181.     An agreement to allocate or divide market participants between competitors within the same horizontal market, constitutes a per se violation of antitrust laws.

182.     The Utah Constitution declares the state is free from antitrust actions: "It is the policy of the state of Utah that a free market system shall govern trade and commerce in this state to promote the dispersion of economic and political power and the general welfare of all the people. Each contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce is prohibited. Except as otherwise provided by statute, it is also prohibited for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce." Utah Constitution, Article XII, § 20.

183.     The Utah Legislature passed the Utah Antitrust Act to allow the courts to enforce a policy of competition on the basis that "the free market system and [] the unrestrained interaction of competitive forces will yield the best allocation of [the State's]

23

economic resources, the lowest prices, the highest quality and the greater material progress…" Utah Code § 76-10-3102.

184.    The aim of the Utah Antitrust Act is to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." Utah Code § 76-10-3102

185.    The market participant should be able to participate in a free market system where he can make choices that it deems important.

186.    As it relates to youth tackle football, there are hundreds of unique reasons that a participate might employ when deciding where to participate.

187.    UCI's boundary rules limit the participant's ability to freely engage in the market   to make best decisions for its participation.

188.    UCI's anticompetitive conduct coupled with its combined monopoly power in the youth tackle football makes it nearly impossible for rivals to compete.

189.    By limiting the participants ability to freely engage in the market, UCI violates the Utah Antitrust Act.

190.    Plaintiffs have been harmed by UCI's anticompetitive conduct and its combined monopoly power because they have been unreasonably restrained from participating in the youth tackle football market with their friends, neighbors, classmates, and teammates from other sports.

## FIRST CAUSE OF ACTION
### MONOPOLIZATION
(Violation of Sherman Act § 2, 15 U.S.C.A. § 2, and
Utah Antitrust Act Utah Code § 76-10-3104)

191.    The foregoing paragraphs are incorporated herein by reference.

192.    As set forth above, UCI has willfully and intentionally engaged in anticompetitive conduct in order to establish and maintain monopoly power in the youth tackle football market in violation of the Sherman Act § 2, 15 U.S.C. § 2 and Utah Code § 76-10-3104.

193.    UCI has effectively restrained, and threaten to restrain further, competition in the youth tackle football market by:

   a.   Appropriating local corresponding high school boundaries, names, colors, and logos to restrict and quash related competition.

   b.   Disallowing other teams from competing in UCI's league unless that team is affiliated with UCI.

   c.   Enforcing its rules in a manner that discourages competition in the market.

194.    Each of these anticompetitive acts is sufficient to constitute an antitrust violation, and taken together, establish an illegal monopolization in violation of Utah's antitrust act.

195.    UCI should be declared to have created a monopoly, attempt to monopolize, and to have conspired with others to monopolize the youth tackle football market.

196.    Plaintiffs, and other consumers and market participants have been damaged as a direct and proximate result of UCI's creation of a monopoly.

197.    Pursuant to the Clayton Act Section 4, 15 U.S.C. § 15 and the Utah Antitrust Act, Utah Code § 76-10-3109(1), UCI is liable for three times the amount of damages sustained, plus the cost of suit, and reasonable attorney fees.

**SECOND CAUSE OF ACTION**
**ILLEGAL RESTRAINT ON TRADE**
(Violation of Sherman Act § 1, 15 U.S.C.A § 1 and
Violation of Utah Antitrust Act Utah Code § 76-10-3104)

198.     The foregoing paragraphs are incorporated herein by reference.

199.     UCI has willfully and intentionally engaged in horizontal restrictions on trade in order to minimize competition between districts for players in violation of the Sherman Act § 2, 15 U.S.C. § 2 and Utah Code § 76-10-3104.

200.     UCI restrains trade and commerce of the youth tackle football market through horizontal restrictions through contract and/or conspiracy with others.

201.     UCI restrains trade and commence through its monopolization of the youth tackle football market as the sole entity that controls the market.

202.     UCI retains trade through contract under its bylaws, and through conspiracy with its districts.

203.     UCI's restraint on trade and commerce is unreasonable because it imposes an unreasonable restraint on trade.

204.     UCI's restraint does not have any procompetitive benefits.

205.     In fact, UCI's restraint on trade allows for some districts to have more competitive teams than others.

206.     UCI's restraint on trade and commerce has such predicable and pernicious anticompetitive effects, and such a limited potential for procompetitive benefits that is unlawful *per se.*

207.     UCI's boundary restrictions are tantamount to schemes to divide consumers into territories in order to reduce competition.

208.     Upon information and belief, UCI has taken actions with market

participants to boycott any perceived competitors with the intent to eliminate competition.

209.     Each of these anticompetitive acts is sufficient to constitute an antitrust violation, and taken together, establish a violation of Utah's antitrust act.

210.     UCI should be declared to be in violation of Utah's Antitrust Act.

211.     Plaintiffs, and other consumers and market participants have been damaged as a direct and proximate result of UCI's restraint on trade.

212.     Pursuant to the Clayton Act Section 4, 15 U.S.C. § 15 and the Utah Antitrust Act, Utah Code § 76-10-3109(1), UCI is liable for three times the amount of damages sustained, plus the cost of suit, and reasonable attorney fees.

### THIRD CAUSE OF ACTION
### TEMPORARY AND PRELIMINARY INJUNCTION
(Clayton Act, 15 U.S.C. § 16, Utah Antitrust Act Utah Code § 76-10-3109)

213.     The foregoing paragraphs are incorporated herein by reference.

214.     Section 16 of the Clayton act, 15 U.S.C. § 16, provides that "[a]ny person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws," including Sections 1 and 2 of the Sherman Act, "when and under the same conditions and principles as injunctive relief ... is granted by courts of equity."

215.     Section 16 of the Clayton Act requires a showing only of threatened loss or damage. In this matter the Plaintiffs can show actual injury and a threatened loss or damage if UCI is not permanently enjoined from its antitrust violations.

216.     Likewise, the Utah Antitrust Act, Utah Code § 76-10-3109(1)(a) authorizes

a party with standing to seek preliminary injunctive relief to prevent violations of the Utah Antitrust Act.

217.     When determining whether to grant temporary injunctive relief the Court should consider the likelihood of Plaintiffs' ultimate success on the merits and equities.

218.     Under the Sherman Act and the Utah Antitrust Act, there is a presumption in favor of preliminary relief when a plaintiff has demonstrated a likelihood of success on the merits because the principal equity weighing in favor of issuance of the injunction is Utah's interest in enforcement of the Utah Antitrust Act.

219.     In other words, once a plaintiff has demonstrated a likelihood of success on the merits, the other factors generally considered when evaluating preliminary injunctions are established by legislative declaration.

220.     In applying the Sherman Act and Utah Antitrust Act, any claims by UCI of proposed harm from the issuance of preliminary relief do not overcome the interest in enforcing antitrust laws.

221.     Plaintiffs are likely to succeed in proving that UCI has a monopoly on the youth tackle football market in Northern Utah.

222.     Plaintiffs are likely to succeed in proving that UCI's restraints on trade and commerce are unreasonable and do not have procompetitive benefits because UCI's horizontal restraints are *per se* antitrust violations.

223.     Plaintiffs are likely to succeed in proving that UCI's restraints on trade will continue its anticompetitive effects in the market.

224.     Any proof that that UCI's monopoly and restraint on trade lessens competition substantially is sufficient to establish that Plaintiffs are likely to succeed.

225.     In the absence of relief, substantial harm to competition will continue to occur.

226.     In the absence of relief, Plaintiffs will be irreparably harmed because Plaintiffs will be prevented from participating in youth tackle football on their teams this year. Plaintiffs will never again be able to get back this year or participate with their teams again.

227.     The preliminary relief requested is in the public's interest because it prevents UCI's anticompetitive behavior.

228.     The court should enter a preliminary injunction to immediately enjoin UCI from enforcing its boundary restrictions in order to prevent further damage to Plaintiffs and other consumers and market participants.

229.     The court immediately require UCI to allow minors T.M. and C.M. to play for the district where they registered to play and allow T.M. and C.M. to be placed on the roster of the teams they made.

230.     The court should immediately require UCI to allow all other consumers and market participants in similar situations to be play for the district where they registered and to play for the teams they made.

231.     The court should immediately require UCI and its districts to reverse any disqualifications of players or coaches for violating the boundary line restrictions, and allow those players and/or coaches to participate in UCI's youth tackle football program.

232.     The court should do this by entry of a temporary restraining order and preliminary injunction.

**FOURTH CAUSE OF ACTION**
**PERMANENT INJUNCTION**

(Clayton Act, 15 U.S.C. § 16, Utah Antitrust Act, Utah Code § 76-10-3109)

233.　　　The foregoing paragraphs are incorporated herein by reference.

234.　　　Section 16 of the Clayton act, 15 U.S.C. § 16, provides that "[a]ny person, firm, corporation or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws," including Sections 1 and 2 of the Sherman Act, "when and under the same conditions and principles as injunctive relief … is granted by courts of equity."

235.　　　This allows for the entry of a permanent injunction.

236.　　　Section 16 of the Clayton Act requires a showing only of threatened loss or damage. In this matter the Plaintiffs can show actual injury and a threatened loss or damage if UCI is not permanently enjoined from its antitrust violations.

237.　　　Likewise, the Utah Antitrust Act, Utah Code § 76-10-3109(1)(a) authorizes a party with standing to seek "appropriate…permanent injunctive relief.

238.　　　The court should enter a permanent injunction to enjoin UCI from enforcing its boundary restrictions against market participants.

239.　　　The Court should enter a permanent injunction to enjoin UCI from prohibiting market participants from registering to play in any UCI district.

240.　　　The Court should enter a permanent injunction to enjoin UCI from excluding any non-UCI youth football teams that meet general youth tackle football standards and rules to participate and compete against other UCI teams.

241.　　　The Court should require UCI and its districts to reverse any disqualifications of players or coaches for violating the boundary line restrictions, and

allow those players and/or coaches to participate in UCI's youth tackle football program

242.     The Court should enter a permanent injunction requiring UCI to case all actions that create its monopoly, its attempt to monopolize, and its ability to conspire with others to monopolize the youth tackle football market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays for judgment in their favor and against the Defendants as follows:

A.  For a declaration that UCI is in violation of the Sherman Act and the Utah Antitrust Act by creating a monopoly, attempting to monopolize, and to have conspired with others to monopolize the youth tackle football market

B.  For a declaration that UCI is in violation of the Sherman Act and the Utah Antitrust Act by restraining trade and commence through its monopolization of the youth tackle football market as the sole entity that controls the market.

C.  For a declaration that UCI is in violation of the Sherman Act and the Utah Antitrust Act by restraining through contract under its bylaws, and through conspiracy with its districts.

D.  For a judgment against UCI for three times the amount of damages sustained, plus the cost of suit, and reasonable attorney fees as required by Sherman Act § 1, Clayton Act § 4, and Utah Code § 76-10-3109.

E.  For an order that UCI is prohibited from using registration fees to pay the judgment or order, or pass the judgment onto market participants by raising registration or football related fees.

F.  For a temporary and preliminary injunction enjoining UCI from enforcing its

boundary restrictions in order to prevent further damage to Plaintiffs and other consumers and market participants.

G. For a temporary and preliminary injunction requiring UCI to allow minors T.M. and C.M. to play for the district where they registered to play and allow T.M. and C.M. to be placed on the roster of the teams they made.

H. For a temporary and preliminary injunction requiring UCI to allow all other consumers and market participants in similar situations to be play for the district where they registered and to play for the teams they made.

I. For a temporary and preliminary injunction requiring UCI to allow any non-UCI youth football teams that meet general youth tackle football standards and rules to participate and compete against other UCI teams.

J. For a temporary and preliminary injunction requiring UCI to reverse any disqualifications of players or coaches if those disqualifications were based upon violation of the boundary line restrictions, and allow those players and/or coaches to participate in UCI's youth tackle football program.

K. For a permanent injunction enjoining UCI from enforcing its boundary restrictions against market participants.

L. For a permanent injunction enjoining UCI from prohibiting market participants from registering to play in any UCI district.

M. For a permanent injunction enjoining UCI from excluding any non-UCI youth football teams that meet general youth tackle football standards and rules to participate and compete against other UCI teams.

N. For a permanent injunction requiring UCI to case all actions that create its

monopoly, its attempt to monopolize, and its ability to conspire with others to monopolize the youth tackle football market.

O. For a permanent injunction requiring UCI to reverse any disqualifications of players or coaches if those disqualifications were based upon violation of the boundary line restrictions, and allow those players and/or coaches to participate in UCI's youth tackle football program.

P. For any necessary Declaratory relief declaring void and unenforceable the rules propagated by UCI in furtherance of its antitrust violations.

Q. For the Court to craft other injunctive remedies to offset UCI's ability to maintain its monopoly, its attempt to monopolize, and its ability to conspire with others to monopolize the youth tackle football market.

R. For all other and further just, legal, and equitable relief the court deems just and proper.

DATED this 11th day of August 2024.

**PARKINSON BENSON POTTER**

/s/ *Brennan H. Moss*
Brennan H. Moss